UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) DOCKETED |
| ALBERT INNARELLI, et al. | ) CR04-30046-MAP |
| | ) |
| Defendants. | ) |

GOVERNMENT'S MEMORANDUM REGARDING CALCULATION OF LOSS

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and William M. Welch II, Assistant United States Attorney, hereby files this response to the defendants' memorandum regarding loss.

A. Determination of Loss

The crime of fraud is complete when the defrauding party takes possession of the funds. United States v. Walker, 234 F.3d 780, 783 (1st Cir. 2000). See also United States v. Lee, 232 F3d 556, 559 (7th Cir. 2000)(fraud complete upon signing of note and transfer of money); United States v. Gregg, 179 F.3d 1312, 1316 (11th Cir. 1999)(finding bank fraud complete when bank made funds available for defendant's use). While an intent to repay may serve to mitigate a defendant's punishment, it does nothing to change the amount of loss suffered at the time of the offense. Walker, 234 F.3d at 783.

"Loss is a proxy for the seriousness of the offense." United States v. Parsons, 141 F.3d 386, 392 (1st Cir. 1998). "[T]he fraud guideline commentary has always provided that where the intended loss is greater than the actual loss, the intended loss is to be used." Id. Where settlement has been made after the crime has been detected, "the later settlement does not reduce [the defendant's] culpability." Id. "[A] defrauder cannot purchase a shorter term by a belated return of the proceeds when the fraud is in the course of unraveling." Id. at 292-293 (citing United States v. Bennett, 37 F.3d 687, 695 (1st Cir. 1994)).

In this case, the intended loss was greater than the actual loss, and therefore, intended loss controls. All of the defendants knew that the lending institutions would not have made the loans in question if the lending institutions had known the true financial picture of the borrowers and the true economic condition of the collateral. The borrowers would not have qualified for any of the loans ultimately conveyed by the lending institutions, and the lending institutions would have denied their loan applications without extending any loans. The defendants knew this fact as evidenced by the false documentation that they submitted to the lending institutions in order to circumvent the certain denial of the loan applications. Therefore, the full amount of the loans is the appropriate measure of intended loss because the loan was the amount of money

2

out of which the defendants intended to deprive the lending institutions.

The defendants concede as much in their Motion. <u>See</u> <u>Memorandum of Law</u>. For example, the defendants claim that the lending institutions were the only victims because "[m]any of the Innarelli buyers, like those in Rostoff, were complicit in the program." <u>Id</u>. at 4. The defendants further state that "[e]qually important, most were in no position to be securing mortgages on the properties charged in the indictment." <u>Id</u>. If the defendants knew that most of the borrowers "were in no position to be securing mortgages," then the defendants knew that the lending institutions never would have issued the loans in the first place if they knew the true financial picture of the borrowers. Consequently, the defendants intended to deprive the lending institutions of the full amount of the loans.

The defendants want to argue that they should receive the benefit of the reasonably foreseeable "natural and probable consequences of their actions, including when their actions caused no loss." <u>Id</u>. at 6. However, that argument is meritless for several reasons.

First, it is difficult to fathom how it was reasonably foreseeable to the defendants that their actions in facilitating fraudulent loans to the borrowers in this case would cause no loss, particularly where the borrowers either "were in no

3

position to be securing mortgages," did not have money for a down payment, did not have a bank account, had to have their income inflated, and/or lived solely on social security or disability would cause no loss.  If anything, the fact pattern of this case establishes the opposite:  the only thing that was reasonably foreseeable to the defendants was that the lending institutions would foreclose upon the borrowers.  The foreclosure rate of the loans arranged by the defendants easily exceeded fifty percent, putting them on further notice of this fact.

It is unfair, unjust, and just plain wrong for the defendants to rely upon the fortuity of market forces to claim now that it was reasonably foreseeable that their actions would cause no loss.  The defendants cannot look into a reverse crystal ball at this moment, impute their intent back in time, and claim that it was reasonably foreseeable to them that their actions would cause no loss.  The basic facts that the defendants knew at the time that they engaged in the scheme to defraud were: (1) that the borrowers had no money; (2) that the properties being sold to the borrowers were overvalued anywhere between two hundred and three hundred percent; and (3) that the defendants had nothing to do with the borrowers after the defendants sold them their properties.  Therefore, the only intent that the defendants could have formulated, and the only reasonably foreseeable consequences that the defendants could have

envisioned, was foreclosure.

It is equally unavailing for the defendants to rely upon the intent of the borrowers to repay the loans. Every borrower probably intended in good faith to repay the loan, but it was the defendants who instilled a false sense of hope and unrealistic expectations in the borrowers given the borrowers' financial circumstances. It is a perverse sense of justice that would allow the defendants to take advantage of the American dream and cruelly lead the borrowers to believe that they could afford to repay a loan two hundred to three hundred percent greater than necessary, but then argue at sentencing that the borrowers' hopelessly optimistic intent to repay should inure to the defendants' benefit.

In the end, the defendants' "intended loss equals actual loss" theory is nothing more than conflating what the defendants knew at the time of the issuance of the loans and what happened in the real estate market years later. The defendants' sole intent was to obtain as large a loan as possible from the lending institutions, and then saddle the borrowers with the responsibility of making those payments. The defendants certainly had no idea what future market force would hold for the borrowers and should not now reap the benefit of those market forces.

§ 2B1.1 does not apply to this case. In <u>United States. v.</u>

McCormac, 309 F.3d 623 (9th Cir. 2002), the Ninth Circuit addressed the precise issue that the defendants now raise. In McCormac, the defendant claimed that Application Note 2(E)(ii) required the court to reduce her intended loss figure by the amount of collateral pledged to secure the loan. The Ninth Circuit rejected that argument, holding that "Application Note 2(E)(ii) is consistent with this circuit's, and our sister circuits', application of the `greater of' rule when we read it to affect the calculation of actual loss, but not intended loss." Id. at 629.

The Ninth Circuit reasoned that Application Note 2(E)(ii) affected actual loss, but not intended loss, because

> Application Note 2(A) provides: `Subject to the exclusions in subdivision (D), loss is the greater of the actual loss or intended loss." U.S. Sentencing Guidelines Manual,§ 2B1.1, cmt. n. 2(A) (2001). Were we to exclude the amount recovered by disposition of collateral in both an actual loss and intended loss calculation, we would essentially read the general rule subject to the exclusions in subdivision (D) and (E), even though the sentencing commission has explicitly limited the exclusions to those enumerated in subdivision (D) only.

Id. at 628. In addition, the Ninth Circuit concluded that

> the 2001 amendments adopt a broad definition of `intended loss.' Intended loss includes the `pecuniary harm that was intended to result from the offense,' whether or not that pecuniary harm "would have been impossible or unlikely to occur." U.S. Sentencing Guidelines Manual § 2B1.1, cmt. n. 2(A)(ii) (2001). *See also* U.S. Sentencing Guidelines

6

>       Manual app. C at 1205 (the broad definition
>       of intended loss precludes using concepts
>       such as "economic reality" in determining
>       intended loss).  Under this definition, it is
>       irrelevant to the intended loss calculation
>       that a bank is unlikely to suffer the total
>       intended loss when a defendant pledges
>       collateral to secure a loan.  To the extent
>       that collateral pledged to secure a loan
>       informs the loss calculation, it affects the
>       calculation of the actual loss and may
>       illuminate the determination of the
>       defendant's intent. *See, e.g.*, <u>United States
>       v. Williams</u>, 292 F.3d 681, 686 (10th Cir.
>       2002)(recovered assets are not automatically
>       deducted from intended loss but collateral
>       pledged "is a valid consideration in
>       evaluating a defendant's realistic intent")
>       (citations omitted).

<u>Id</u>.  Finally, the Ninth Circuit stated that "the 2001 amendments to the sentencing guidelines for fraud make clear that intended loss should not be an inquiry into intent to repay, as suggested by case law interpreting the prior sentencing guideline, but rather should focus on the intended financial harm." <u>Id</u>. at 629. In making its decision, the Ninth Circuit joined several other circuits. See <u>United States v. Nichols</u>, 229 F.3d 975, 979 (10th Cir. 2000)("The fact that a victim has recovered part of its loss after discovery of a fraud does not diminish the defendant's culpability for purposes of sentencing"); <u>United States v. Johnson</u>, 16 F.3d 166, 170-71 (7th Cir. 1994)(even if the victim was able to recoup some of the loss, the Guidelines direct that intended loss should be considered if it is greater than the actual loss); <u>United States v. Johnson</u>, 908 F.2d 396, 398 (8th

Cir. 1990)(the offense level does not turn on whether the banks recovered any of their losses, but turns on the loss the defendant attempted to inflict).

§ 2B1.1 does not apply in this because this case involves intended loss, not actual loss. Moreover, § 2B1.1 also does not apply because § 2B1.1 clearly only applies to collateral "<u>pledged or otherwise provided by the defendant</u>." (emphasis added). In this case, the defendants pledged nothing and provided nothing. Instead, the defendants caused the borrowers to assume mortgages that did not reflect the true value of their properties, and then walked away from the fraud, leaving the borrowers to fend for themselves. Where the victims of the fraud, not the defendants, assumed all of the financial risk, it hardly seems just or consistent with the plain language of the Guidelines to reduce the defendants' loss figure based upon the victims' pledge of collateral.

Finally, the defendants seem to say that the court must go through a detailed analysis of income earned from loans, mortgages paid off, loans sold at foreclosure and other factors. The defendants are incorrect. Application Note 2(C) of § 2B1.1 states that "the court need only make a reasonable estimate of the loss." <u>See</u> also <u>United States v. Alli</u>, 444 F.3d 34, 38 (1st Cir. 2006). A court does not "need[] to engage in more refined forecasts of just how successful the scheme was likely to be."

8

United States v. Egemnonye, 62 F.3d 425, 429 (1st Cir. 1995). Given the complexity of the fraud and the size of the fraud, it is reasonable for the court to estimate the loss figure without resorting to the financial number crunching suggested, but not actually provided or attempted, by the defendants.

  B. <u>Borrowers as Victims</u>

  The individual borrowers in this case were all victims. Virtually all of the individual buyers did not know that the appraised value of their homes had been fraudulently inflated, consequently causing the individual buyers to make monthly mortgage payments two or three times greater than required. The defendants never fully informed any of the individual buyers of this fact and concealed the true condition of the homes being purchased from virtually all of the individual buyers.

         Respectfully submitted,

         MICHAEL J. SULLIVAN
         United States Attorney


          /s/ William M. Welch II
         WILLIAM M. WELCH II
         Assistant United States Attorney

CERTIFICATE OF SERVICE

Hampden, ss.                              Springfield, Massachusetts
                                          August 16, 2006


    I, William M. Welch, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing by electronic service upon:

all defense counsel of record


                                                          /s/ William M. Welch II
                                             WILLIAM M. WELCH II
                                             Assistant United States Attorney