UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ALBERT INNARELLI, ET AL.<br>Defendants. | CRIM. NO. 04-30046-MAP<br><br><br><br>SEPTEMBER 8, 2006 |

## AFFIDAVIT HOLLY HUEBNER RYAN, CPA

I, Holly Huebner Ryan, being duly sworn, depose and say:

1. I am of legal age and believe in the obligations of an oath.

2. The information contained within this sworn statement is based upon my own personal knowledge.

3. I live in Avon, Connecticut.

4. I am a Certified Public Accountant with 25 years experience in the field of commercial lending institutions and banks.

5. I have worked in the real estate loan accounting area and also on the real estate analysis side. The latter involves reviewing many loan packages before and after the funding of loans.

6. I have been employed by both large and small banks. I have worked in an auditor capacity and also as an outside consultant.

7. I have reviewed all types of loans and their corresponding documents for accounting accuracy, regulatory compliance, and loan quality. I have reviewed many loan packages sold by or bought from banks. In that connection, my experience includes investigating delinquencies and property income streams.

1

8. Based upon my extensive background in lending, I have also examined prospective loans to low income borrowers. These are often considered by banks in order to meet Community Reinvestment Act banking regulations. For a more detailed articulation of my professional history, please see my curriculum vitae attached as <u>Exhibit A</u>.

9. I was retained by Shipman & Goodwin LLP in April 2006 to perform a gain/loss financial analysis in the case of <u>United States v. Innarelli</u>, CR04-30046-MAP, pending in the United States District Court, District of Massachusetts.

10. My analysis reveals that as a whole, the loans in which Mr. Innarelli had a role, resulted in a net total gain of $1,072,936 to the group of the relevant lenders as a result of their funding of the loans. The gain documented is determined based upon an examination of each loan's documentation and an analysis of the actual results. It considers a calculation of interest earned, lender fees earned at closing, prepayment penalties received, and a share (thirty percent) of the credit life insurance premium the lenders receive from the life insurance company whose products are purchased. Documentation supporting my analysis may be found at attached <u>Exhibits B</u> through <u>I</u>.

11. I was able to review the loan files for most of the loans. The following four loans, however, had missing loan documentation:

    a) 170 Massasoit    No note, mortgage or HUD closing docs.

    b) 12-14 James St.    No File.

    c) 25 Colchester    Partial file. No note or HUD closing docs.

      d) 66 Crystal       No note.

12.    For each of the above four loans, however, standardized estimates were used for the interest rate, loan term, and payment amount, based on the substantial available documentation that I examined concerning the loan policies and practices the same lenders were using at the time the loans closed.

13.    I personally reviewed each relevant loan file. I verified the loan amount, loan rate, loan term, and loan payments to a copy of the signed note. For loans files with missing notes, I verified the loan amounts and dates to the Hampden County Registry of Deeds website under the BROWNtech Document Management Systems section (http://204.213.242.147/alis/ww400r.pgm). Also verified to the same website, were the date of mortgage discharge, the amount received at foreclosure and final sale, and the respective dates of these events. I verified credit life insurance, broker fees, lender fees, attorney fees, and title insurance amounts to a copy of the signed HUD closing statement. Based upon my prior experience with similar residential loan files, I made a conservative assumption that the relevant lenders earn a 30% commission on selling the credit life insurance to the borrower.

14.    I verified loan amounts listed in the superseding indictment to a copy of either the signed note or mortgage. When the note or mortgage was not available, I verified the loan amount to the Hampden County Registry of Deeds website.

15.    My examination of these documents disclosed that the superseding indictment was overstated by a small amount, $2,666, due to errors on two loans listed

(81 Barber St. should be $56,950, not $59,620; and 126 Cedar St. should be $89,954, not $89,950).

16. My examination of these documents also disclosed that the "wire amount" as stated in the superseding indictment is not the wire amount; rather, it is the loan amount. The wire amount is less than the loan amount due to costs incurred at the loan closing that the lenders credited themselves from the gross loan amount charged to the buyers. After the corrections, the total actual wire amount was $235,907 less than the total loan amount.

17. In cases where the wire amount was not available, I utilized the stated loan amount. A correct summary of the total loans in the superseding indictment is as follows:

|  | # of loans | Loan Amt | Wire Amt | Difference |
|---|---|---|---|---|
| Wire fraud | 67 | $ 5,141,887 | $ 4,993,500 | |
| Overt acts | 29 | $ 1,878,141 | $ 1,787,951 | |
| Total before corrections | 96 | $ 7,020,024 | $ 6,781,451 | |
| Recording errors in superseding indictment | | | | |
| 81 Barber St | | $ (2,670) | no change | |
| 126 Cedar St | | $ 4 | no change | |
| Total corrected superseding indictment amt | 96 | $ 7,017,358 | $ 6,781,451 | $ 235,907 |

18. To determine the gain or loss incurred, I grouped all of these loans into the following categories

   a) Loans that are still earning.

4

    b) Loans where the mortgage had been discharged by the lender.

    c) Loans that had been foreclosed with the foreclosure being the final sale.

    d) Loans that were foreclosed by the lender and later resold to another party.

  19. To arrive at the total that lenders gained or lost on the relevant **loan balances**, the balances on loans still earning (the first category) are not relevant. The only relevance of such loans to the calculation of total gain or loss is the income derived from them. Nine of the 96 loans listed in the superseding indictment are still *earning loans*. There is no evidence that any of these nine loans have resulted in any loss; they have been on the lenders' books for an average of 5 years.

  20. With respect to the nine *earning loans*, lenders have earned income in consideration of the following factors:

    a) interest paid while the loan is performing;

    b) lender "closing fees" -- those fees collected by the lender at closing such as underwriting fees, processing fees, document preparation fees, commitment fees, points, etc.; and

    c) credit life insurance premiums shared by the insurers with lenders, which are calculated conservatively to be 30%.

For the nine *earning loans,* the calculation of total earnings is as follows:

| | | |
|---|---|---|
| Interest earned through 5/31/2006 | $ | 363,390 |
| Lender Closing Fees | $ | 8,834 |
| Credit Life Ins 30% | $ | 2,859 |
| Total earned from the earning loans | $ | 375,083 |

5

21. Apart from the evident actual gain for these nine loans, even the potential loss to the original lender is minimal. In five of the nine earning loans, the mortgages were assigned to other lenders. Of the remaining four loans, three have an "Assignment of Rents" clause in the mortgage, where the lender can attach the rents for the mortgage payment. Only one loan (154 Oak Grove) does not have an "Assignment of Rents" clause, or a mortgage assigned to another lender, and it maintains a principal balance, as of 5/31/2006, of $62,751.

22. The second category of the 96 mortgages includes thirty-six loans that were discharged by the lender. *Mortgage discharges* occur when the loan is paid off, usually due to sale or the refinance of the property by the borrower. The lender then discharges the mortgage obligation. No further loss can be associated with such mortgages. The amount earned (gained) by the lenders from these mortgages is calculated based upon the earnings evident in the files through the pay off date. The examination of the records discloses the following:

| | |
|---|---:|
| Interest earned through discharge | $ 853,964 |
| Lender Closing Fees | $ 19,048 |
| Prepayment penalties | $ 8,694 |
| Credit Life Ins 30% | $ 6,613 |
| Total earned from discharge mortgages | $ 888,319 |

23. In the foregoing analysis, the "interest earned" is calculated through the sale date or the new mortgage (refinance) date or, when the records did not show such dates, through the discharge date. Prepayment penalty clauses that provided further income to the lender were applicable to four loans that refinanced with another lender

within three years of the loan's original closing date. The 36 discharged loans were on the lenders books an average of 3.3 years.

24.   The third category includes *loans sold at foreclosure*, which occur when the lender forecloses on a loan due to non-payment and then the lender sells the property at a foreclosure sale. The following analysis is used to calculate the gain/loss for the properties sold at foreclosure. Based upon industry practices and experience, a conservative attribution of payments received prior to foreclosure considers that the borrower stops making payments fifteen months prior to foreclosure. Loss on the sale of foreclosure loans is calculated by considering the balance to be amortized through such date fifteen months prior to foreclosure. I arrived at this conclusion also based upon the study of the actual files in this case. The exact stop payment date is used, however, in six out of 11 loans (or 55%) because such date in such cases is indicated in the loan file. One loan in this foreclosed category was guaranteed by the Department of USA Housing and Urban Development (HUD), where the lender was made whole on the loan. The calculation of loss to the lenders included in this study, however, *includes* the principal loss to HUD after it sold the property.

| | | |
|---|---:|---:|
| Principal bal through estimated time of default | 758,985 | |
| Foreclosure proceeds | 614,245 | |
| Net Principal Loss | 144,740 | $ (144,740) |
| | | |
| HUD purchase of guaranteed foreclosed loans | 107,028 | |
| HUD sale of guaranteed loans | 60,000 | |
| Loss on sale of HUD guaranteed loans | 47,028 | $ (47,028) |
| Interest earned through estimated time of default | | $ 111,297 |
| Lender Closing Fees | | $ 10,944 |
| Credit Life Ins 30% | | $ 1,058 |
| Total loss from sale of foreclosed loans | | $ (68,469) |

7

25. The final category includes *loans sold after foreclosure*, which occurs when lenders do not sell the properties associated with each mortgage at a foreclosure sale, but instead hold the properties and sell them at a later date. To calculate the gain/loss to lenders, the same analysis set forth in the above foreclosure category applies here. The exact actual stop payment dates are used for 15 of the 40 loans (or 38%) in this group because such dates in such cases are indicated in the loan file. In this group there are five HUD guarantee loans that were subsequently sold by HUD, they are treated as explained above.

| | | |
|---|---:|---:|
| Principal bal through estimated time of default | 2,854,513 | |
| Less Final Sale proceeds | 2,386,368 | |
| Net Principal Loss | 468,145 | $ (468,145) |
| Interest earned through estimated time of default | | $ 397,461 |
| Lender Closing Fees | | $ 53,595 |
| Credit Life Ins 30% | | $ 7,749 |
| HUD purchase of guaranteed foreclosed loans | 572,157 | |
| HUD sale of guaranteed loans | 459,500 | |
| Loss on sale of HUD guaranteed loans | 112,657 | $ (112,657) |
| Total loss on foreclosed loans | | $ (121,997) |

26. The total gain/loss to the lenders for the loans listed in the superseding indictment is calculated by totaling the four categories described above. As set forth below, this calculation indicates that the lenders experienced a net gain of $1,072,936. A summary of this calculation is shown below.

| | # of loans | Loan Amt |
|---|---|---|
| **SUMMARY (OF GAIN)** | | |
| Wire fraud | 67 | $5,141,883 |
| Overt acts | 29 | $1,878,141 |
| Total before corrections | 96 | $7,020,024 |
| Recording errors in superseding indictment | | |
| 81 Barber St | | $(2,670) |
| 126 Cedar St | | $4 |
| Total corrected superseding indictment amt | 96 | $7,017,358 |
| Mortgage discharged | -36 | $(2,682,819) |
| Loans still earning | -9 | $(689,225) |
| Less Principal paid before loans foreclosed | | $(31,816) |
| Foreclosure proceeds | -51 | $(3,000,613) |
| HUD loss | | $159,685 |
| Interest earned | | $(1,726,113) |
| Lender closing fees | | $(92,421) |
| Prepayment penalty fees | | $(8,694) |
| 30% of Credit Life Ins | | $(18,278) |
| Total Net Gain | 0 | $(1,072,936) |

27. The analysis of gain/loss set forth above displays the experience of the lenders for all 96 loans, viewed as a group. The following summarizes these same

gains and losses, organized by individual lender: The majority of the 17 lenders experienced gains; 4 lenders (and HUD) experienced losses.

| Lender | Innarelli Loans | Other defendants loans | Total Gain/(Loss) |
|---|---|---|---|
| Avondale | 32,298 | 0 | 32,298 |
| Country Wide | 222,666 | 12,264 | 234,930 |
| Diverse | 38,721 | 0 | 38,721 |
| Equicredit | 719,221 | 36,741 | 755,962 |
| GRA | 10,591 | 0 | 10,591 |
| McCue | 76,162 | 0 | 76,162 |
| National City | 47,551 | 0 | 47,551 |
| Alliance | 74,255 | 0 | 74,255 |
| Delta | 43,826 | 0 | 43,826 |
| Option One | 10,808 | 0 | 10,808 |
| Ames | (17,387) | 0 | (17,387) |
| Accubank | (25,255) | 0 | (25,255) |
| ARM | (25,029) | 0 | (25,029) |
| MAS | 29,261 | 0 | 29,261 |
| Merit | (5,068) | 0 | (5,068) |
| HUD | (159,685) | (45,155) | (204,840) |
| Indy Mac | 0 | 12,374 | 12,374 |
| Total | 1,072,936 | 16,224 | 1,089,160 |

28.   A matter separate and apart from the calculation of gain/loss to the lenders was examined during my study of the loan files. Specifically, the loan files disclosed the amount of legal fees and other income to Attorney Innarelli associated with the 96 loans. In the ordinary course of performing the real estate closings, Innarelli collected $57,970 in legal fees and $19,252 in commissions on the title insurance.

29.   Mortgage companies and banks are in the business of issuing loans and collecting income on the interest and fees charged. Other ways of collecting income on the loans is to sell a group or portfolio of loans to a government agency and continue to service the portfolio based on a fee schedule.

30. The mortgage lending process is regulated by both state and federal laws. The U.S. Department of Housing and Urban Development (HUD) sponsors a broad range of programs designed to revitalize urban neighborhoods, encourage home ownership opportunities and provide affordable housing. HUD will guarantee loans that follow their underwriting guidelines for mortgage lenders and banks approved by HUD as a qualified HUD lender.

31. The Community Reinvestment Act also regulates banks. This regulation requires banks to lend to the metropolitan statistical areas in which it has a main office or branches. The Community Reinvestment Act and its implementing regulations are intended to encourage banks to help meet the credit needs of their local communities, including low and moderate income neighborhoods. The banks have to report annually on such loans to the Federal Reserve. The regulations preclude lenders from backing out on all high risk loans.

32. The loans examined in this case are those of a kind issued to low and moderate income neighborhoods, with some qualifying under applicable regulations for certain lenders in predetermined lending areas. All such loans are known by the lenders who issue them to have more risks and, correspondingly, substantially higher interest rates charged, to enable more reward for the risk. Many of the loans examined were for rental properties which categorically have a higher interest rate.

33. Based upon the foregoing, the lenders funded the subject loans anticipating substantial up front fees and a stream of income from substantially higher

interest rates than available from issuing traditional residential loans to other more financially secure borrowers.

34. The lending in this case is more risky than mainstream residential lending, but these lenders intend to participate in a niche lending market. The lenders are experienced and, based upon that experience with such loans, prepared to place loans in the geographic area of these 96 loans. The record reflects, as well, that these lenders continue to lend similarly, despite having some loans become nonperforming or delinquent.

35. It is evident from the records examined, both within the 96 files and on the official websites, that the lenders in this case anticipated income substantially similar to the income actually experienced on these 96 loans, in the form of the high interest, fees, and the like. Accordingly, the substantial evidence I reviewed leads to the conclusion that the actual experience of these loans is probative of the value the lenders received at the time that they issued the loans.

36. The lenders, irrespective of falsities involved in the loan documents, expected substantial income, just as they subsequently experienced, along with the risk of some non performing loans. Notwithstanding that fifty-one of the ninety-six loans went into foreclosure, there was money to be made, even on many of the later foreclosed loans.

37. The attached analysis demonstrates that although the lenders lost money on principal of foreclosed loans as a group, the lenders also incurred income gain over time from the accumulated interest and fees. Foreclosed loans made money, as

anticipated by these lenders, due to the lending structure the lenders utilized, and the amount of time they were profitably on the lenders' books, and the amount the lenders received from the foreclosure sale.

38. Due to the market niche in which these lenders participated, as well as certain regulatory requirements for lending to low-to-moderate income neighborhoods, these lenders expect to incur some losses on some loans. At the time of the lenders' issuance of the loans, however, the lenders also expected to offset that share of foreclosed loan losses by earning interest and fees on the foreclosed loans and on the loans that paid until sale or refinancing by the borrower.

39. For all of these loans, the lenders earn, *up front*, the various applicable fees they charge, as well as some of the interest before the borrower refinances, sells the property, or the bank forecloses. In fact, mortgage rates started to drop in 2001 through 2004. The higher rate loans would usually payoff due to refinancing the loans at a lower rate. Thus, for example, thirty-six of the ninety-six loans were refinanced and the mortgages discharged. Four of the thirty six loans incurred prepayment penalty fees of $8,694.

40. The lenders also have internal goals to achieve with regard to total number of loans to issue. These goals cannot preclude the low-to-moderate income neighborhoods.

41. The notion of computing loss based on the price paid by a defendant for a property, before the defendant sold it to the borrower, minus the stated loan value, is arbitrary. It is contrary to what the industry would consider in evaluating the loans

involved in this case, and contrary to what the lenders themselves would consider. The lenders are accustomed to making loans in the relevant metropolitan area. Although the information contained in the particular loan files would be relevant, there are many other considerations that a lender evaluates in making the decision to issue a loan. The considerable experience of the lenders, and the other information that was available to the lenders indicates that the value of the properties and their corresponding mortgage loans were reasonably connected to the actual experience of the lender for similar properties indicated on the records.

42. The amount for which a defendant acquired a property does not in itself logically or factually establish the value of the property. The previous lender of the property could be one of many who enter the market anxious to sell the property at a foreclosure sale price, in order to cut the carrying costs, or to take a nonperforming loan off their books, or for a host of other internal business reasons. There could be many other variables that factor into the reason for selling an individual property at a lower price than the property could support. These reasons vary by lender and we do not have privy to them.

43. The statements contained in this affidavit are true and accurate to the best of my knowledge.

44. I am willing to testify in court regarding the statements contained in this affidavit.

*Holly Huebner Ryan*
Holly Huebner Ryan

State of Connecticut
County of Hartford

Subscribed and sworn to before me
This 8th day of September, 2006.

*Marilyn L. Hammond*
Marilyn L. Hammond
Notary Public

Commission Expires 4/30/2008

## CERTIFICATION

I hereby certify that the foregoing Affidavit of Holly Huebner Ryan, CPA, with attached exhibits, was filed electronically on this 8th day of September, 2006, and was sent via regular mail on that same date to the following parties:

Mark G. Mastroianni
Steven W. Leary, Esq.
95 State Street, Suite 309
Springfield, MA 01103
413-737-1489
Fax: 413-733-0238

Vincent A. Bongiorni, Esq.
95 State Street, Suite 309
Springfield, MA 01103
413-732-0222
Fax: 413-746-4970

Michael O. Jennings, Esq.
73 Chestnut Street
Springfield, MA 01103
413-737-7349
Fax: 413-731-1302

Terry S. Nagel, Esq.
95 State Street, Suite 918
Springfield, MA 01103
413-731-8811
Fax: 413-731-6641

William H. Kettlewell, Esq.
Maria Durant, Esq.
Dwyer & Collora, LLP
600 Atlantic Avenue
Boston, MA 02210
617-371-1005
Fax: 617-371-1037

Robert Santaniello, Jr., Esq.
Santaniello & Santaniello
83 State Street, 3rd Floor
Springfield, MA 01103
413-781-2132
Fax: 413-732-7515

Jack St. Clair, Esq.
73 Chestnut Street
Springfield, MA 01103
413-737-5000
Fax: 413-731-1302

Mark J. Albano, Esq.
Dalsey, Ferrara & Albano
73 State Street, Suite 101
Springfield, MA 01103
413-736-6971
Fax: 413-746-9224

Thomas A. Kokonowski, Esq.
Antonucci & Associates
Stockbridge Street
Springfield, MA 01103
413-737-9700
Fax: 413-732-3132

Kevin G. Murphy, Esq.
Pessolano, Dusel, Murphy & Casartello, PC
115 State Street, 5th Floor
Springfield, MA 01103
413-781-4700
Fax: 413-781-0471

Peter M. Murphy, Esq.
101 State Street, Suite 715
Springfield, MA 01103
413-733-1222
Fax: 413-733-1245

Gary A. Ensor, Esq.
34 Bridge Street
South Hadley, MA 01075
413-315-6152
Fax: 413-315-6153

I hereby certify that the foregoing Affidavit of Holly Huebner Ryan, CPA with attached exhibits, was hand-delivered on this 8th day of September, 2006 to:

William M. Welch, II
U.S. Attorney's Office
Suite 310
1550 Main Street
Springfield, MA 01103
413-785-0237
Fax: 413-785-0394

Richard Rinaldi
U.S. Probation Officer
Probation Department
1550 Main Street, Rm 212
Springfield, MA 01103
413-785-0250
Fax: 413-785-0257

_____
Moira L. Buckley