UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-N-04-30046-MAP |
| | ) | |
| v. | ) | |
| | ) | |
| ALBERT INNARELLI, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Michael J.
Sullivan, United States Attorney for the District Necessitate
Massachusetts, and Paul Hart Smyth, Assistant United States
Attorney, hereby files this sentencing memorandum.  The United
States has attached to this sentencing memorandum Attachment A,
which represents all of the fraudulent loans processed through
the defendant's IOLTA account from 1998 through May, 2002.  The
United States asserts that this information is fair for the court
to consider in determining where within the guideline range it
should sentence the defendant and in evaluating the Title 18,
United States Code, Section 3553 factors.

**I.    The Scope, Heartlessness and Community Impact Of The Scheme
To Defraud Requires A Sentence At The High End Of The
Guideline.**

A. Scope of the Fraud

The sheer breadth of this scheme to defraud and the number
of victims demand a sentence at the high end of the sentencing

1

guideline range.  The Superseding Indictment alone charges defendant Innarelli with having defrauded approximately sixteen lending institutions and over ninety individual victims out of more than $7,000,000.00.  Defendant Innarelli pled guilty to the full scope and breadth of the charged scheme to defraud.

As further evidence of the breadth of this scheme, the Government has attached to this sentencing memorandum Attachment A.  Attachment A is a listing of 292 fraudulent loan transactions processed through defendant Innarelli's IOLTA account from late 1997 through May, 2002.  The gross amount of those loans equals approximately $20,000,000.00.  The number of individual victims exceeds 200.

Attachment A is simply defendant Innarelli's IOLTA check register edited to exclude extraneous or irrelevant check entries and those loan transactions identified as not fraudulent.  Any checks written for recording fees, title insurance, water and sewer taxes, and other types of fees or payments not relevant to the present case were redacted.  All of the other information contained within Attachment A, such as check dates, check numbers, payees, and information contained on the memo line of the checks, came directly from defendant Innarelli's IOLTA check register.  Where italicized information appears in the memo section column, this is identifying information not originally found in defendant Innarelli's IOLTA check register, but rather

2

added by the Government based upon witness interviews or the
Hampden County Registry of Deeds.

Ultimately, defendant Innarelli's IOLTA check register and
consequently Attachment A were corroborated by investigating
agents.  They did so by comparing the IOLTA check register to:
the original IOLTA bank statements and original IOLTA checks;
subpoenaed loan files establishing a particular defendant's
involvement in a particular real estate transaction; witness or
co-conspirator interviews establishing a particular defendant's
involvement in a particular real estate transaction; and the
recorded purchasers and sellers of a particular real estate
transaction and the pertinent dates of that transaction per the
Hampden County Registry of Deeds.  The investigating agents found
defendant Innarelli's IOLTA account to be accurate and reliable.

The fraudulent loans are readily identifiable.  For example,
Equicredit had a one year seasoning requirement for its loans.
In other words, Equicredit required one year to pass between the
purchase of a piece of property and its subsequent re-sale.
Therefore, any Equicredit loan processed through defendant
Innarelli's IOLTA account that had been "flipped", or bought and
sold within a short period of time, is by definition fraudulent
because Equicredit would not have approved the loan but for a
fraudulent misrepresentation regarding the seasoning requirement.
The loans also conditioned other indicia of fraud, such as the

3

presence of a second mortgage or money being passed back to a
buyer at the time of closing.

Defendant Innarelli was the "gatekeeper" for this scheme to
defraud.  He was uniquely positioned to prevent this fraud from
occurring in two important ways.  First, defendant Innarelli
represented the lending institutions and consequently had a
fiduciary duty to his clients to prevent them from being
defrauded.  Second, defendant Innarelli had an ethical obligation
to his profession.  He had a duty and responsibility to insure
that he would not practice law in a way that harmed his clients,
the public and his profession.  To say that defendant Innarelli
did not dutifully discharge his fiduciary or ethical obligations
would be an understatement of massive proportion.

Defendant Innarelli did not just open the gate and permit
whole scale fraud.  Defendant Innarelli removed the gate and then
charged all those who passed through, both the witting and the
unwitting, a fee that proved to be exorbitant both in terms of
financial and human costs.

B. Heartlessness of the Fraud

The arrogance and brazenness of the fraud defies
comprehension.  The buyers were unsophisticated, first-time home
buyers who thought that they were about to realize the American
Dream:  the purchase of their own home.  They were individuals
teetering on the brink of economic survival who believed that

they had finally achieved some measure of economic success.
Defendant Innarelli and his co-defendants exploited the buyers'
hopes and dreams to line their own pockets.  Not only did
defendant Innarelli and his co-defendants defraud the buyers out
of money, but also out of their dignity and self-respect, a cost
that no Pre-Sentence Report can quantify.

The examples of the callousness of this scheme, particularly
as they apply to this defendant, are numerous.  They range from
defendant Innarelli not allowing buyers to read the closing
documents thoroughly, to rushing buyers through the closing, to
misrepresenting the nature of second mortgages and other
documents that the buyer had to sign.  The most egregious example
of the callousness of the scheme to defraud was defendant
Innarelli's decision not to use loan proceeds to pay outstanding
taxes and water bills on some of the flipped properties because
he knew that the lending institutions would foreclose upon the
buyers within a matter of months.  Instead, Innarelli pocketed
the money and paid only if the buyer became aware of the non-
payment through notices from the City of Springfield.

C. <u>Community Impact of the Fraud</u>

The impact of this fraud on the community has been
devastating.  The neighborhoods in which defendant Innarelli and
his co-defendants preyed were the very neighborhoods that would
have benefitted the most from buyers who legitimately qualified

for loans.  These buyers would have had the financial wherewithal to improve and rehabilitate their homes.  The improvements in their residences would have meant a personal and financial investment in their neighborhoods, and hopefully kick started a an economic and communal rejuvenation of these neighborhoods. The increased tax base would have assisted a school system and city sorely in need of the additional tax revenues.

Instead, the fraud simply perpetuated a cycle of disrepair and downturn in these neighborhoods.  Unqualified buyers could not afford to make improvements, leading to foreclosures.  The foreclosed properties then stood abandoned, leading to vandalism and other forms of property damage.  All of this simply exacerbated the difficulties faced by these already stressed neighborhoods and its inhabitants.

**II.  There Is No Basis For Departure For Extraordinary Family Circumstances, Drug Addiction, Gambling Addiction, Or Pre-Sentence Rehabilitation.**

A departure based on extraordinary family ties and responsibilities pursuant to U.S.S.G. §5H1.6 would be *per se* unreasonable under <u>Booker</u> given the facts of this case.  The family circumstances and responsibilities of a defendant are a discouraged ground on which to base departures and are not ordinarily relevant in determining whether a departure is warranted.  U.S.S.G. § 5H1.6; <u>United States v. Roselli</u>, 366 F.3d 58, 68 (1st Cir. 2004); <u>United States v. Louis</u>, 300 F.3d 78, 81-

82 (1st Cir. 2002).    A departure for extraordinary family circumstances may be appropriate where the care provided by the defendant is "irreplaceable or otherwise extraordinary." Roselli, 366 F.3d at 68 (quoting United States v. Pereira, 272 F.3d 76, 82 (1st Cir. 2001)).   The standard requires the district court to determine "whether there are feasible alternatives of care that are relatively comparable to what the defendant provides." Id.

Departures for exceptional family circumstances are warranted only on rare occasions, because "time-consuming family responsibilities, by themselves, are not sufficient to take a case out of the 'heartland.'" Pereira, 272 F.3d at 80, 82-83 (reversing departure based on the defendant's role in caring for his elderly parents because the defendant did not provide specialized care, his siblings were available to help with the parents' care, and home nursing services provided an adequate alternative during the period of the defendant's incarceration). See also United States v. Carr, 932 F.2d 67, 72-73 (1st Cir. 1991)(departure based on family circumstances unwarranted because, even though defendant and her husband both faced prison terms, their four year-old child could be cared for by defendant's mother during their incarceration); United States v. Chestna, 962 F.2d 103, 107(1st Cir. 1992)(incarcerating a single mother of four young children not exceptional because single mother status is not an idiosyncratic circumstance); United

States v. Sweeting, 213 F.3d 95, 104-05 (3rd Cir. 2000)
(departure not appropriate for a single mother of five children,
one of whom had Tourette Syndrome, where the care provided by the
mother was to engage in daily exercise with the child, to help
him keep his school and home tasks organized, to administer his
medicine when necessary, and to remove certain foods from his
diet).

Departures have been upheld in limited circumstances where a
defendant was so irreplaceable that incarceration would cause
exceptional hardship to his family. Roselli, 366 F.3d 58,69-70
(departure warranted where two of defendant's four children,
including infant, had Cystic Fibrosis, the children required 24
hour care, defendant provided specialized care requiring
training, defendant's spouse suffered from chronic and
debilitating pain condition and no other family members lived in
the area who could provide assistance during period of
incarceration; United States v. Sclamo, 997 F.2d 970, 974 (1st
Cir. 1993)(departure affirmed where the defendant's stepson, who
suffered from a psychiatric disorder and had a long history of
aggressive and disruptive behavior, was making dramatic progress
largely because of the support and care of the defendant;
defendant's role could not practically have been filled by any
other person; United States v. Rivera, 994 F.2d 942, 952-54 (1st
Cir. 1993)(district court might justifiably depart on remand

8

where single mother of three young children who received income only from welfare and had virtually no contact with or support from other family members might be irreplaceable).

Defendant Innarelli is not "irreplaceable" as it relates to his children. The Government does not dispute that the defendant, like many fathers, is clearly loved and respected by his children, and that they will undoubtedly suffer during his incarceration. However, the reason that departures on the basis of family circumstances are discouraged is because all defendants have families; any time a defendant is incarcerated it presents difficult challenges for the family. In that respect, defendant Innarelli is no different than any other defendant with children.

It is clear that defendant Innarelli is not the primary provider for his children. His children currently live with their mother. The fact that his ex-wife is a pediatric resident and works long hours does not make the defendant irreplaceable or constitute an extraordinary family circumstance. In that regard, the defendant is nothing more than a glorified babysitter. The Government is sure that the defendant's ex-wife can find other child care providers, who, unlike this defendant, do not have previous multi-year cocaine, alcohol and gambling addictions.

Moreover, the fact that the defendant has spent the last two years actually being a competent father to his two children does not mean that he should receive a lenient sentence now. While

laudable, two years of sobriety and paternal maturity does not ameliorate seven years of alcohol, drug and gambling dependency and wide-scale fraud.

Finally, defendant Innarelli does not deserve a more lenient sentence due to extraordinary pre-sentence rehabilitation. Defendant Innarelli did not rehabilitate himself voluntarily. Defendant Innarelli engaged in rehabilitation only *after* he had been caught stealing $600,000.00 from clients and had been ordered to undergo drug and gambling counseling under threat of imprisonment. Defendant Innarelli faced the possibility of having his probation revoked and the imposition of ten years incarceration if he violated any of his state probation conditions, including obtaining drug and gambling counseling. It hardly seems fair or just to the victims in this case to reward defendant Innarelli with a more lenient sentence for changing his personal life choices only after the Sword of Damocles had been hung over his head.[1]

_____

[1]Defendant Innarelli may claim that he informed the Government from the inception of the case that he intended to plead guilty. While this is true, such promises certainly do not constitute extraordinary pre-sentence rehabilitation. The fact remains that defendant Innarelli did **not** formally indicate his decision to plead guilty until the Government threatened to object to a three level reduction for acceptance of responsibility unless defendant Innarelli and his co-defendants announced their intention to plead guilty by mid-March, 2006. Thus, defendant Innarelli's previous promises were largely meaningless until the Government forced his hand.

Filed this 18th day of September, 2006.

                         Respectfully submitted,

                         MICHAEL J. SULLIVAN
                         United States Attorney


                         /s/ Paul Hart Smyth
                         _____
                         PAUL HART SMYTH
                         Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

Hampden,  ss.                        Springfield, Massachusetts
                                     September 18, 2006


        I, Paul Hart Smyth, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by electronic
filing and by facsimile ((860)251-5219) upon:

Moira Buckley, Esq.


                        /s/ Paul Hart Smyth
                        _____
                        Paul Hart Smyth
                        Assistant United States Attorney